# Case No. 9,065.

## The MARENGO.

[1 Lowell, 52;[1] 1 Am. Law Rev. 88.]

District Court, D. Massachusetts. April 11, 1866.

LIBEL FOR DAMAGES—COMPENSATION FOR USE OF A VESSEL—PART OWNER—DISSENT TO VOYAGE.

1. A part-owner of a vessel, dissenting from a voyage, and receiving a stipulation from the other owners for the vessel's safe return, is not entitled to compensation for the use of his part of the vessel during the voyage.

[Cited in Coyne v. Caples, 8 Fed. 639; Scull v. Raymond, 18 Fed. 550; Head v. Amoskeag Manuf'g Co., 113 U. S. 23, 5 Sup. Ct. 447.]
[Cited in Swain v. Knapp, 34 Minn. 236, 25 N. W. 399.]

2. A court of admiralty has no jurisdiction of a claim by a part-owner dissenting from a voyage, for the use or destruction, during the voyage, of his share of the outfits. The remedy is in equity.

[Cited in Lewis v. Kinney, Case No. 8,325; The H. E. Willard, 52 Fed. 388, 53 Fed. 600.]

In the year 1859, the libellant brought his libel in this court, and therein alleged that

---

[1] [Reported by Hon. John Lowell, LL. D., District Judge, and here reprinted by permission.]

the respondents were owners of three fourth parts of the ship Marengo, and were about to send her to sea on a whaling voyage, against the remonstrance of the libellant, who owned the remaining one-fourth part; and he prayed that his share might be appraised, and stipulation be taken in this court for its safe return: all which was done. At his request, his share of the outfits remaining on board the vessel from her former voyage was not included in the appraisement nor in the stipulation. The Marengo [Case No. 9,066]. The vessel made her voyage, and returned in safety to New Bedford, her port of departure, according to the exigency of the stipulation, bringing a very valuable cargo of oil; and this libel in personam was brought to recover compensation for the use of the libellant's part of the vessel, together with the value of such of the outfits above mentioned as were consumed in the course of the voyage. The law of England, which we have followed in this country, approximates the co-ownership of vessels to other commercial associations in this, that it gives to a majority in interest of the owners the right to control the employment of the chattel. A court of admiralty will, in their favor, dispossess the minority, or a master holding under and for them. If the majority, however, wish to employ the vessel in a way and upon a service from which the minority dissent, the court will require security to be given, as in this case, for her safe return. Story, Partn. § 428; 3 Kent, Comm. 152. So will a court of equity in cases not within the jurisdiction of the admiralty. Haly v. Goodson, 2 Mer. 77. It is upon this doctrine and practice that the libellant founds his claim to compensation. We say that the law which authorizes another person to use his property ought to require payment to be made for that use. It is like the taking of private property for public uses, which, by a principle universally admitted, and expressly sanctioned by the fundamental law of nearly every state of the Union, can only be done upon just compensation to the owner.

T. Parsons, R. C. Pitman, and W. W. Crapo, for libellant.

B. R. Curtis, T. D. Eliot, and T. M. Stetson, for respondents.

LOWELL, District Judge. The libellant contends that the law has taken his property,[a] or required it to be taken for the benefit of the respondents. It would be more strictly accurate to say, that the law allowed the respondents to use their own property, or to dictate the use of the common property. The libellant's property happened to be, from its own nature, inseparable from theirs; but it may have been as great a hardship for them to be obliged to use it, involving, as such use must, an outlay and risk beyond their proper proportion, as it was for the libellant to have the vessel go upon a voyage

which he did not approve. In the average of cases, it is equally probable that the majority would be embarrassed by the necessity of equipping and providing the whole vessel, as that the minority would be embarrassed by the necessity of providing for their part. It must be considered, then, as a difference of opinion between persons otherwise equal, excepting in their shares in the common chattel. The minority could hardly expect that their opinion should prevail; and the question then arises between the enforced idleness of the vessel, and her use according to the wish of the greater interest. The law says the latter alternative shall be adopted. The minority have full right to join in the enterprise, but refuse: the vessel sails at the sole risk and expense of the majority. Does it not logically follow that it shall be for their sole profit? This voyage happened to be successful. If there had been a loss, the libellant would not have shared it. What share shall he have in the gain? It is said that so much only is demanded as may fairly be due for the bare use of the libellant's fractional interest, after allowance for insurance and all other proper charges. The argument would be unanswerable, if the parties were strangers, and their property divisible; but in fact the compulsion and the hardship are or may be as great on one side as on the other. The respondents must either use the libellant's property, or let their own lie idle; and, to do this, they must furnish a capital, and assume a risk, proportionately greater than the use of their own fraction would require.

Again, the reason usually assigned for the rule is, that the free use and circulation of commercial property may be promoted. Now, if the majority owners are required to charter as well as to insure the whole vessel, it is to be feared that the burden will be too great, and that the contention would come to be, not who should employ the vessel, but who should evade this responsibility; and so the design of the law would be defeated.

The rights of a minority, indeed, are not fully equal to those of a majority, either in this or in other associations, whether social, political, or commercial. It is difficult to see how they can be made so. Perhaps, in this particular case, a law authorizing the sale of the ship under proper regulations might give the nearest approach to such equality. For in truth the actual hardship of their position comes chiefly from the fact that a small fraction of a ship does not readily find a purchaser. If it were as salable as the shares in any well-known stock company, the difficulty would be as nearly met as could be expected in a matter of this kind. But, whether this be so or not, I cannot believe that the remedy now sought to be applied would work fairly for the other owners. In theory of law, the choice is, as has been said, between the use and the idleness of the ship: if she is used, and the minority will not take their chances of the adventure, they are insured;

if she were not used, they would earn nothing, and so they are not injured. Their rights are more fully protected than in most other similar cases. If they were partners or joint owners in a stock company, the majority could compel them to take the risks of any lawful enterprise. Here they have their option. That congress might well be asked to regulate this matter, I readily admit, for the rule does not seem so well adapted to modern voyages as to those of earlier times; but whether the regulation should extend to granting compensation, in all cases, to the minority owner, I very much doubt.

The weight of authority agrees with what I have supposed to be the true reason of the case. In an English case in chancery, decided in 1680, which brought up this point, the plaintiff was nonsuit. Anonymous, 2 Ch. Cas. 36. This action was taken upon consideration of a certificate of the course of the admiralty, made by Sir Lionel Jenkins, to whom this question was referred by the lord chancellor. See 2 Wynne's Life of Sir L. Jenkins, p. 792. The language of that learned judge is very explicit, as well as forcible. "I humbly submit," he says, "unto your lordship, that, in regard Mr. Clare was, according to the ancient practice of the admiralty of England in such cases, duly summoned, and admonished to contribute his quota as part-owner to the setting out of the ship, as the other part-owners did, and that he refused or at least neglected so to do; and that thereupon a due appraisement was made, and bail given by Mr. Newton, and other owners of the other parts, to bring back the ship, and consequently Mr. Clare's part in it, within the time limited in the acts of court for letting his part go out upon bail; or else, in case the ship should miscarry, to pay him the value of his part, as it stood appraised before its setting out, and that the said Mr. Clare's part was repaired, fitted, and set out in those voyages at the charge of the said other part-owners,—he, the said Mr. Clare, ought not, by the civil law, nor by the practice of the admiralty of our neighboring nations, nor particularly by the course of the admiralty in England, to have any share in the freight or any other profits made by the said ship in those voyages. If the law and practice in England were otherwise, it would be very mischievous to our shipping and navigation, the greatest part whereof being carried on by the contribution and joint power of part-owners, all partnership would cease, if a partner bearing no part of the burden should come to a share of the profits. Nor would there scarce any sea voyage go forward, if it were not in the power of the major part of the owners to overrule a cross-grained partner, and dispose of the whole ship," &c.

In a recent case, this doctrine has been reaffirmed, with the addition, that where the dissent was not notified until after the vessel had been repaired, and fitted for the voyage, the dissenting owner, though not entitled to

any share of the earnings, must contribute his proportion of the repairs and outfits. Davis v. Johnston, 4 Sim. 539.

Although the point has not been directly decided in this country, yet the early case above cited is strong evidence of what the law was when our jurisprudence assumed a separate character. And the opinions of our jurists have generally coincided with the English doctrine. See Willings v. Blight [Case No.17,765]; Story, Partn. § 431; 3 Kent, Comm. 152. And the course of practice and forms of stipulations in use here accord with this view. In a late treatise of acknowledged value, it is indeed suggested that the point is still open, and reasons are given in support of the position now taken by the libellant. 2 Pars. Mar. Law, 558. In the present case I have had the great advantage of the able development and illustration of these reasons by the learned author, in argument at the bar: but I cannot persuade myself that the law is still unsettled; and upon authority, if not upon the reasoning of the case, I must decide for the respondents.

The claim of compensation for the use or destruction of outfits is beyond the jurisdiction of a court of admiralty. A court of equity is the proper tribunal for the adjustment of accounts between part-owners. Kellum v. Emerson [Case No. 7,669]. It is true that the account in this case might be a very simple one, but that is not the test of the jurisdiction. The subject-matter is not within the cognizance of the court. The same objection would hold to the claim for earnings, considered as an item of an equitable account between part-owners. In undertaking to decide it, I have regarded it only as a demand for compensation in the nature of freight, due at all events, without regard to the issue of the enterprise, as upon a compulsory letting of the libellant's fraction of the vessel. If part-owners would be liable to make such a payment, it might be recovered here. Libel dismissed.